567 So.2d 569 (1990)
Teri DOBSON, et al.
v.
LOUISIANA POWER AND LIGHT COMPANY.
Nos. 89-C-2894, 89-C-2931.
Supreme Court of Louisiana.
September 6, 1990.
Rehearing Denied October 18, 1990.
*570 Eugene G. Taggart, George F. Riess, Kenneth P. Carter, Kathryn J. Lichtenberg, W. Glenn Burns, Monroe & Lemann, for Louisiana Power & Light, defendant-respondent.
J. Thomas Anderson, Baham & Anderson, for Teri Dobson, et al., plaintiffs-applicants.
DENNIS, Justice.[*]
This is a wrongful death action, pursuant to Louisiana Civil Code article 2315.2, by the surviving spouse and five minor children of a tree trimmer, Dwane L. Dobson, who was electrocuted on April 24, 1985 when his metallically reinforced safety rope contacted an uninsulated 8,000 volt electric power distribution line. The trial court awarded the widow and her children $1,034,054.50 in damages, after finding the deceased free of fault and holding the Louisiana Power & Light Company liable in negligence for failure to maintain its right of way, insulate its high voltage distribution line, or give adequate warnings of the line's dangerous nature. The court of appeal affirmed the decree as to the power company's negligence, but reversed in part, reducing the plaintiff's recovery by 70% based on a finding that the deceased had been guilty of fault to that degree. Dobson v. Louisiana Power & Light Co., 550 So.2d 1334 (La.App. 1st Cir.1989).
The facts, as the trial judge found them, were as follows: Dwane L. Dobson, a 29 year old tree trimmer, was electrocuted while attempting to remove a pine tree from the backyard of a house owned by a Mrs. Davidge in Hammond, Louisiana. The tree was located near the rear property line, which was adjacent to a right of way for LP & L's uninsulated high voltage distribution *571 lines serving an apartment complex. Dobson was wearing a safety line he had made by inserting a metal wire inside a 13 foot nylon rope. He used the safety line to lash himself to the tree while cutting with his chain saw, and he had inserted the wire in the rope to prevent it from being accidentally severed by the saw. Just prior to the accident, Dobson had cut a section from the top of the tree and had lowered it with the help of his coworkers below. As he descended to cut another section, his safety line touched one of the uninsulated distribution lines and he was electrocuted.
The LP & L high voltage distribution lines behind Mrs. Davidge's property were installed in 1968 to carry electricity 315 feet from Wardline Road to the University Apartments. The lines were elevated from the road to a point behind the Davidge house and placed underground from there to the apartments. LP & L originally intended that the entire span be buried to serve other commercial purposes but those developments did not occur.
Mrs. Davidge complained many times to LP & L about hazards created by the condition of the elevated lines and the right of way behind her house. She complained about transformers blowing up, limbs falling into the wires, fires caused by trees falling on the lines, and having to call the city fire department to extinguish the blazes. Some time prior to the accident she asked LP & L to remove a pine tree behind her house because it was "spindly" and overhanging the power lines. This was the same tree she later hired Dobson to remove. LP & L rejected her requests because the base of the tree was in her backyard and not in LP & L's right of way. LP & L never came to inspect or remove the tree. During this time LP & L suffered from the lack of adequate funds to properly trim trees in its rights of way in the Hammond area. Also, LP & L had no regular team or program devoted exclusively to the inspection of its lines and rights of way but relied on its employees to watch for dangers as they performed other duties.
Dobson had started his tree trimming service several months before his death. He had no formal training but was learning from hard work, experience and talking with other local tree trimmers. After he accidentally damaged a single residence service line at another location in Hammond, an LP & L representative informed him that LP & L would lower such single unit service lines to facilitate tree trimming and that LP & L would assist him generally in the future. The LP & L representative did not inform Dobson that some of its major distribution lines, unlike its single residence service lines, were uninsulated or that LP & L would lower or de-energize major distribution lines for his tree trimming jobs. The day before Dobson's death he was successful in getting LP & L to lower a single consumer service line during his work. However, because Dobson had no reason to believe that LP & L would have lowered or deenergized the major distribution lines serving the apartment complex to facilitate his removal of the pine tree for Mrs. Davidge, he did not request LP & L to do so.
The trial judge concluded that LP & L was guilty of several negligent acts or omissions that caused the fatal accident: Despite LP & L's constructive and actual knowledge of the dangers created by its uninsulated lines and right of way conditions, it failed to perform adequate inspections of its electric lines, trim or remove the tree or trees creating the hazard, provide insulated covering of dangerous parts of the lines, or place adequate warnings of the high voltage electricity on or near its uncovered wires. Furthermore, the trial judge found that even though LP & L had actual knowledge that Dobson was an inexperienced tree trimmer who would be working near its uninsulated distribution lines in Hammond, the company failed to warn Dobson of the dangers associated with its high voltage distribution lines. With respect to Dobson, the trial judge ultimately found that he did not know of or appreciate the special danger created by the uninsulated overhead high voltage distribution lines; and further that Dobson was not negligent *572 because he was unaware of the extreme danger.
The trial court's purely factual findings were free of clear or manifest error. For example, its resolution of the most hotly contested factual issuewhether Dobson was unaware that the distribution lines were not insulatedwas based on reasonable inferences of fact and evaluations of credibility.
As an important background fact, the evidence clearly established the great disparity of danger between "distribution" lines and "service" lines. "Distribution" lines are uninsulated wires used to deliver very high voltage electricityas much as 8,000 voltsthroughout the community. In contrast, "service" lines are insulated with nonconductive covering and used to transfer much lower voltage electricity from distribution lines to individual dwellings. Despite this great difference in danger, distribution lines carry no special markings or warnings but are black in color and similar in appearance to service lines. Dobson's coworkers and relatives testified that they thought the distribution lines were insulated both because they appeared to have black covering and because birds and squirrels traversed them without harm. Thus, the trier of fact reasonably could have inferred that the distribution line's appearance belied its lethally uninsulated nature and made it difficult for an untrained person to appreciate its fatally dangerous character.[1]
The evidence was in conflict regarding whether Dobson had knowledge of the dangers of the distribution lines. On the one hand, Dobson's coworkers and relatives testified that he was ignorant of the deadly conductivity of the distribution lines, and the plaintiffs' experts were of the opinion that his actions prior to the accident indicated that he was unaware of the danger. On the other hand, a power company trouble-shooter testified that he had talked to Dobson on two occasions prior to the accident and that it was his habit to warn tree trimmers of such dangers and to offer to drop or deenergize power lines for them. In the aggregate, however, the trouble-shooter's testimony was equivocal as to whether he had warned Dobson, specifically, of the absence of insulation on distribution lines or had definitely offered to deenergize them for Dobson's operations.[2] Moreover, these conversations *573 occurred only because Dobson had accidentally knocked down service lines at two dwellings and the company representative had come to inspect the damage and to repair the service lines. Thus, the service line incidents involved only property damage to insulated service lines and had no direct relationship to the risk of personal injury or death created by uninsulated distribution lines or the need for precautions against such hazards. Additionally, there is no evidence that prior to the accident Dobson had ever had any first hand experience with uninsulated distribution lines or had received any demonstrative instruction in how to identify and guard against their dangers. Therefore, the evidence is easily susceptible to the reasonable inference that the trouble-shooter's discussions with Dobson focused primarily on the prevention of future damage to the company's insulated service lines rather than on Dobson's safety while working around uninsulated distribution lines. This inference bolsters the trial court's reasonable decision to credit the testimony of the plaintiffs' witnesses to the effect that Dobson was unaware of the extreme danger of the uninsulated distribution lines before the accident. Where there are factual issues upon which the evidence is in conflict, reasonable evaluations of credibility and reasonable inferences of fact by the trial court should not be disturbed on review. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring, 283 So.2d 716 (La.1973).
Nevertheless, we agree with the court of appeal that the trial court made a reversible mistake in concluding that Dobson was free of any fault that caused the accident. Although the trial court did not commit any manifest error or clearly wrong determination in its purely factual findings, it fell into what was essentially an error of law in its approach to the question of whether Dobson was negligent. The crucial mistake was its assumption that, because Dobson had no actual notice or knowledge of the true nature of the uninsulated distribution lines, or the extraordinary hazard they created, he was not required by law to recognize this danger. Any person is required by law to recognize that his conduct involves a risk of causing harm to himself if a reasonable person would do so while exercising such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence and judgment as a reasonable person would have. Restatement (Second) of Torts § 289(a) (1965). See also Harper James & Gray, The Law of Torts § 16.5 (1986); Prosser & Keeton on Torts § 32 (5th ed. 1984); cf. Levi v. SLEMCO, 542 So.2d 1081 (La.1989). A reasonable person who has an ordinary amount of exposure to the facts of modern life in America should be treated as though he knows that any electrical line could be dangerous. Cates v. Beauregard Elec. Coop., 328 So.2d 367 (La.1976); Coulon v. City of Alexandria, 44 So.2d 171 (La.App. 2d Cir.1950); Harper, James & Gray, supra § 16.5 at 406, 408 n. *574 38; see also Restatement (Second) of Torts § 290 comment e; see generally Annotation, Liability for injury or death resulting when object is manually brought into contact with, or close proximity to, electrical line, 33 A.L.R. 4th 809 (1984). In addition to the knowledge with which people generally may be charged, any reasonably prudent person who engages in an occupation such as tree trimming which requires that he work close to electric lines is under a peculiar obligation to acquire the knowledge and ability required to identify uninsulated power lines and to take precautions against the extreme dangers they pose. See Harper, James & Gray § 16.5 at 410; See also generally Speiser, Krause & Gans, The American Law of Torts § 12:31 (1986); Prosser & Keeton, supra § 32 at 185. Consequently, Dobson was required to recognize that his conduct near the uninsulated power lines created a risk of physical harm to himself, and his failure to take precautions to avoid the risk of which he should have known amounted to negligence.
We see no error in the Court of Appeal's conclusion that LP & L was guilty of negligence that caused Dobson's death and should be held at least partially responsible for the damages occasioned by the accident. But we granted certiorari because the percentages of fault assigned by the Court of Appeal seemed out of line. Also, we felt called upon to further elaborate a method for determining the degree or percentage of negligence attributable to a person for purposes of reducing recovery due to comparative fault under Civil Code Article 2323. Dobson v. Louisiana Power & Light Co., 559 So.2d 129 (La.1990).
Under our Civil Code, every act of a person that causes damage to another obliges the one by whose fault it happened to repair it. La.C.C. art. 2315. If a person dies due to the fault of another, suit may be brought by the surviving spouse and children of the deceased to recover damages which they sustained as a result of the death. La.C.C. art. 2315.2. For purposes of this liability, a person's fault includes his negligence, imprudence or want of skill. La.C.C. art. 2316. When contributory negligence is applicable to a claim for damages, and a person suffers death as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the death. La.C.C. art. 2323.
The generally accepted view is that negligence is defined as conduct which falls below the standard established by law for the protection of others against an unreasonable risk of harm. Restatement (Second) of Torts, § 282 (1965); Harper, James & Gray, supra § 16.1 at 381-382; Prosser & Keeton on Torts, § 31 (5th ed. 1984).[3] The test for determining whether a risk is unreasonable is supplied by the following formula. The amount of caution "demanded of a person by an occasion is the resultant of three factors: the likelihood that his conduct will injure others, *575 taken with the seriousness of the injury if it happens, and balanced against the interest which he must sacrifice, or the cost of the precaution he must take, to avoid the risk.". L. Hand, J. in Conway v. O'Brien, 111 F.2d 611, 612 (2d Cir.1940). If the product of the likelihood of injury multiplied times the seriousness of the injury exceeds the burden of the precautions, the risk is unreasonable and the failure to take precautions or sacrifice the interest is negligence. Id. See also, Levi v. SLEMCO, supra; Allien v. Louisiana Power & Light Co., 202 So.2d 704 (La.App. 3d Cir.1967); Harper, James & Gray, supra § 16.9. The foregoing conception has been referred to by legal scholars as the "Hand formula," the "Learned Hand test" or the "risk-benefit" balancing test. See Prosser & Keeton, supra § 31 at 173 n. 46; Harper, James & Gray, supra § 16.9 at 468 n. 5; G. Rodgers, Rationality and Tort Theory, 54 S.Cal.L. Rev. 1, 8 (1980); R. Epstein, A Theory of Strict Liability, 2 J.Legal Stud. 151, 154 (1973); R. Posner, A Theory of Negligence, 1 J.Legal Stud. 29, 33 (1972); G. Calabresi & J. Hirschoff, Toward a Test for Strict Liability of Torts, 81 Yale L.J. 1055, 1056 (1972).
We believe that the Hand formula also may be used to measure and compare the negligence or fault of one person with that of another. See D. Sobelsohn, Comparing Fault, 60 Ind.L.J. 413, 421-22 (1985). Indeed, Judge Hand, the author of the test, invoked it to help measure whether a driver's negligence had been gross or ordinary under the Vermont "guest-occupant" law. Moisan v. Loftus, 178 F.2d 148 (2d Cir. 1949). The authors of Harper, James & Gray, The Law of Torts, cogently observe that "[t]he same risk, furthermore, may be avoidable at different sacrifices or other costs by different actors, and the reasonableness or unreasonableness of a failure to avoid that risk may vary correspondingly among those actors." Harper, James & Gray, supra § 16.9 at 481. By the same token, Professor David Sobelsohn has argued persuasively that, "[i]f `fault' means a `departure from a standard of conduct required of a person by society for the protection of his neighbors,' `comparing fault' ought to mean a comparison of the extent to which each party deviated from the applicable standard of conduct." Sobelsohn, supra at 419. See also Comparative Negligence Law & Practice § 19.10[2][a] at 19-41 (1990).
In Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985) this court adopted the practice of looking to the Uniform Comparative Fault Act for a checklist of some of the various factors that may be relevant in determining the percentage or degree of fault to be assigned to each party. In its comment to § 2, the Uniform Act provides:
[t]he conduct of the claimant or of any defendant may be more or less at fault, depending upon all the circumstances including such matters as (1) whether the conduct was mere inadvertence or engaged in with an awareness of the danger involved, (2) the magnitude of the risk created by the conduct, including the number of persons endangered and the potential seriousness of the injury, (3) the significance of what the actor was seeking to attain by his conduct, (4) the actor's superior or inferior capacities, and (5) the particular circumstances, such as the existence of an emergency requiring a hasty decision.
UNIF. COMPARATIVE FAULT ACT § 2, comment (1979), 12 U.L.A. 39 (1990).
The Hand formula provides a method for accommodating and weighing all of these factors including the more subjective factors, such as the existence of an emergency, a party's capacity, or his awareness of the risk. Sobelsohn, supra at 421-422. The Hand formula, or balancing process, moreover, helps to "center attention upon which one of the factors may be determinative in any given situation." L. Hand, J. in Moisan v. Loftus, 178 F.2d 148, 149 (2d Cir.1949); see also Washington v. Louisiana Power & Light, Co., 555 So.2d 1350, 1355 (La.1990); Epstien, supra at 157.
It assists us to concentrate here on the costs of the precautions necessary to avoid the accident because the magnitude of the danger caused by the conduct of either Dobson or LP & L was extreme. If the *576 risk that a person might come into contact with the bare high voltage distribution line were to take effect, the anticipated gravity of the loss was of the highest degree. Dobson's conduct in lowering himself down the tree trunk with a metallically reinforced safety line dangling below near the electric wires substantially increased the possibility of such an accident. But so did LP & L's conduct in transmitting high voltage electricity through its uninsulated distribution lines in a residential subdivision without regular inspection of its equipment and right of way, regular maintenance of its right of way by trimming unsafe trees and limbs, insulation of its lines in close proximity to trees, or installation of adequate warnings of the dangerous uninsulated condition of the distribution lines. The chances of an accident were further increased when LP & L, by refusing to respond to Mrs. Davidge's complaints, encouraged her to take it upon herself to remove the limbs and trees in close proximity to the uninsulated distribution lines. The odds of an electrocution were raised again when LP & L failed to warn Dobson specifically of the uninsulated distribution lines although the company had knowledge that he was a new, inexperienced tree trimmer working in the neighborhood where the lines were located.
Confining ourselves to the factor of the cost of taking an effective precaution to avoid the risk, it appears to us that the cost or burden of eliminating the danger would have been greater for Dobson than for LP & L. As we have indicated, the power company had a number of relatively inexpensive, efficacious precautions available to it, e.g., inspection, maintenance, partial insulation, public education and visible warnings. Moreover, there was one particularly effective way in which LP & L could have eliminated the risk at little or no costby explicitly warning Dobson about the uninsulated high voltage distribution lines and telling him how to distinguish them from the insulated dwelling service lines. On the other hand, the cost to Dobson, who was ignorant of the characteristics of the uninsulated distribution lines and therefore unaware of their special danger, exceeded the cost to a person with superior capacity and knowledge. An actor with "inferior" capacity to avoid harm must expend more effort to avoid a danger than need a person with "superior" ability. See R. Posner, Tort Law: Cases and Economic Analysis 230-31 (1982); Sobelsohn, supra at 422. A person about to cause injury inadvertently must expend much more effort to avoid the danger than need one who is at least aware of the danger involved. Sobelsohn, supra at 422; Comparative Negligence, supra § 19.10[2][a] at 19-44. For this reason courts have traditionally cited "awareness of danger" as a factor distinguishing mere negligence from the higher state of culpability commonly known as "recklessness" or "willful and wanton conduct." See e.g., Ellis v. Ferguson, 238 Ark. 776, 385 S.W.2d 154 (1965); Restatement (Second) of Torts § 500 comment g. (1965); Prosser & Keeton, supra, § 34 at 212-14.
In conclusion we believe that, while the magnitude of the risk of harm created by either Dobson or LP & L was great, under the circumstances of the present case, the cost of taking effective precautions to avoid the risk was greater for the tree trimmer than for the power company. This disparity is heightened by the fact that LP & L was clearly in a superior position to avoid the danger. Because the cost of taking effective precautions was significantly less for LP & L than for Dobson, the fault of LP & L was the greater of the two. We do not think that the unreasonableness of LP & L's conduct was so great as to be double the fault of Dobson. But we conclude that a palpable majority of the fault should be attributed to the power company in order to achieve substantial justice in this case. Accordingly, we attribute 60% of the negligence herein to LP & L and 40% to Dobson. Consequently, the recovery of plaintiffs, the surviving spouse and five minor children, will be reduced by 40%.
The decree will be modified as follows. The judgment of the trial court is reinstated except that the principal amount of the judgment, $1,034,054.50, shall be reduced *577 by 40% and all court costs shall be assessed to the defendant.
AFFIRMED IN PART; AMENDED IN PART.
LEMMON, J., concurs and assigns reasons.
MARCUS, J., dissents for reasons assigned by COLE, J.
COLE, J., dissents for reasons assigned.
MELVIN A. SHORTESS, J. Pro Tem., dissents with reasons.
LEMMON, Justice, concurring.
I agree with the majority's treatment of the liability issue. However, I believe that the use of the Watson factors in apportioning fault provides the necessary balancing and flexibility for quantifying each party's deviation from the appropriate standard of care. In my view the Learned Hand test may be more restrictive or confusing and less useful to juries. I therefore concur in the result.[1]
COLE, Justice (dissenting).
I dissent from the majority's decision allocating 60% of the fault to LP & L and 40% to decedent. For the reasons stated herein, I believe decedent's conduct was the sole cause of the accident. A review of the record shows decedent's actions did not conform to the standard of care that would be exercised by a reasonable man.
Uncontradicted testimony in the record shows decedent was warned by LP & L of the dangers of the power line and offered assistance by LP & L. Decedent in fact had sought such assistance on another tree trimming job shortly before his death. Vincent Cavaretta, a utility man with LP & L, testified he encountered decedent on at least two occasions. The first occasion involved an incident where a tree decedent was trimming fell and tore a service drop line which supplied electricity to a house. Cavaretta repaired the line. He informed Dobson to be very careful when working around the lines. He told decedent if he had any problems while working around the lines to contact LP & L first.
On April 18, 1985, decedent contacted LP & L and requested it drop a line supplying power to a street light in preparation for a job on April 23, 1985 (the day before decedent's death).[1] Cavaretta responded to the request, the line was dropped and decedent performed his job without incident. At trial, plaintiffs argued that Cavaretta's warnings applied solely to the service line and not to primary distribution lines. The majority apparently agrees with this argument and finds Cavaretta's testimony was "equivocal" as to whether Dobson was properly warned. However, this conclusion is clearly negated by Cavaretta's uncontradicted testimony:
Q Okay. What else did you tell him?
A We had spokennow, you're asking me for the two occasions that we talked, right?
Q Yes sir?
A On one of those two occasions, and it sticks out that it was on that date, for some reason it stands in my mind that that was when I told him about the question that he had asked that we would not drop primary distribution voltage wires; we would not kill service, to more than one house, and I told him in so many words, that we do it on an individual basis, and that we would come out, andand assess thethe situation and decide whether we could temporarily disrupt power to that area, if we could, we would do it, either by physically de-energizing the wire, or physically letting it *578 down, whatever it would take. If we didn't deem it possible to kill service [or] to de-energize service to that section, we would have our right of way people assess what had to be done and do whatever it took to remove the trees.
Q All right. And so that the record is clear, did you ever warnto the best of your recollection, did you every warn Mr. Dobson about the dangers of working around power lines?
A Yeah.[2]
Record, p. 471.
Decedent apparently understood Cavaretta's warning, since he asked for and received LP & L's assistance on a prior occasion. The actions of decedent on the day of his death goes against plaintiffs' argument that he did not appreciate the dangers posed by the primary distribution line. Dewey Dobson, decedent's brother, testified that one purpose for decedent's rigging of the tag or safety lines was to keep the tree branches away from the power lines. By taking such an action, decedent demonstrated he knew of the existence of the lines and the danger of working around them.[3]
Given this knowledge, Dobson was clearly negligent in not advising LP & L he was working in close proximity to the power lines. Even if he believed the primary distribution line could not be dropped in the same manner as a service line, Cavaretta made it clear to him that there were several alternate methods which would allow decedent to work safely around the line. Decedent's failure to warn LP & L amounted to a gross breach of his duty to exercise the standard of care expected of a reasonable person under the circumstances.
It is also noteworthy that decedent had several opportunities to notify LP & L. He could have done so prior to beginning the job, as he did on the prior occasion. He could have done so on the morning he commenced work. Finally, when the branch fell on the line, apparently with enough force to break one of the wires, decedent should have been put on notice to immediately cease work and notify LP & L.
In addition to decedent's failure to warn LP & L, other aspects of his conduct show a disregard for his own safety. There was expert testimony showing decedent violated several provisions of the American National Standard for Tree Care Operations. The standards specifically prohibit a non-qualified tree trimmer such as Dobson from working closer than ten feet from a power line; nonetheless, decedent worked within three feet of the line. The regulations require the tree trimmer to climb up or down a tree on the opposite side of the power line, whereas decedent attempted to descend between the tree and the power line. Decedent used a flip line with a conductive steel core, whereas the safety rules strictly prohibit the use of conductive tools or materials while working around power lines. Had decedent followed any one of these rules, the accident in all probability would have never occurred.
Further, a review of the law in this area shows the majority's holding clearly conflicts with the established jurisprudence. In Simon v. Southwest Louisiana Electric Membership Corp., 390 So.2d 1265 (La. 1980), we outlined the scope of the power companies' duty:

*579 We recognize that electric companies who utilize and maintain high power lines are required to exercise the utmost care to reduce the hazards to life as far as is practicable. Nessmith v. Central La. Electric Co., 257 So.2d 744 (La.App. 3d Cir.1972), writ den., 261 La. 483, 259 So.2d 921, 922 (La.1972). If it should be reasonably anticipated that persons may come into contact with electric lines, the operator of those lines is required to insulate them, or to give adequate warning of the danger, or to take other proper and reasonable precautions to prevent injury. Nessmith, supra. However, an electric company is not legally bound to safeguard against occurrences that cannot be reasonably expected or contemplated. Bordelon v. Continental Casualty Co., 229 So.2d 761 (La.App. 3d Cir. 1969), writ den., 255 La. 483, 231 So.2d 396 (1970). We agree with the court of appeal that operators of power lines are not required to anticipate every possible accident which may occur and are not the insurers of safety of persons moving around power lines in the course of everyday living.
390 So.2d at 1268.
We further elucidated the scope of this duty in Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982), where we held injury caused by contacting uninsulated power lines did not fall within the ambit of strict or absolute liability, but should be controlled by negligence principles:
[T]he transmission of electricity over isolated high tension power lines is an everyday occurrence in every parish in this state and can be done without a high degree of risk of injury. And when the activity results in injury, it is almost always because of substandard conduct on the part of either the utility, the victim or a third party.
418 So.2d at 499.
In both Simon, supra, and Kent, supra, the court found the types of accidents which occurred could not have been anticipated by the utility and was therefore not within the scope of the duty owed by the utility to the injured plaintiff.[4] In Hebert v. Gulf States Utilities Co., 426 So.2d 111 (La.1983), the court did find a breach of duty on the part of the utility. The plaintiff in Hebert was engaged in constructing a metal building. An electrical servitude was behind the construction site and carried four overhead power lines. Plaintiff struck the lines while using a crane, without sustaining injury. As a result of this incident, the utility turned off power to the lines while the crane was in use. Thereafter, power was restored to the lines. Plaintiff was severely injured when a metal beam he was carrying contacted the electric line.
In allowing recovery against the utility, the court noted the utility had the greater knowledge and direct control over the source of the injury. We found the plaintiff's conduct did not preclude his recovery, and that he acted reasonably under the circumstances. However, the injury in Hebert, supra, occurred in 1977, prior to the adoption of comparative fault, and a finding of contributory negligence on the part of plaintiff would have eliminated any recovery.
In Levi v. Southwest Louisiana Electric Membership Cooperative, 542 So.2d 1081 (La.1989), an oil field roustabout-pumper was severely injured when the erected mast of a paraffin removal truck rig upon which he was working came in contact with an uninsulated 14,400 volt electric distribution line. The lower courts found the utility company had exercised reasonable care. This court reversed and remanded. In determining *580 the utility company's duty, we identified two key areas of inquiry:
The crucial questions are (a) whether the power company was required to recognize that its conduct involved a risk of causing physical injury or loss to another in the manner of that sustained by the plaintiff, and, if so, (b) whether the possibility of such injury or loss constituted an unreasonable risk of harm. These issues are decisive under either a duty-risk or a traditional negligence approach.
542 So.2d at 1083.
In applying this standard to the facts, the court noted the utility company was aware of the oil companies' use of trucks with erectable high masts around its power lines, and had taken significant precautions against this danger when choosing the route of its lines. Further, we found the utility company had "actual knowledge" of previous instances of oil field worker's negligence in moving erect masts under uninsulated power lines. Given the gravity of the harm, we concluded several different kinds of precautions could have been taken by the utility company to eliminate or reduce the hazard posed by its uninsulated high voltage line. We found the lower courts committed manifest error in not holding the utility company's failure to take these precautions constituted negligence, which a majority of the court found was a legal cause of plaintiff's injury.[5]
The court recently had an opportunity to further address the scope of this duty in Washington v. Louisiana Power and Light, 555 So.2d 1350 (La.1990). Washington involved a decedent who was killed when he accidentally allowed a citizens band radio antenna to come in contact with an uninsulated 8000 volt electric wire that spanned his back yard. In reviewing the record, we found decedent was aware of the hazards of the power line. He had in fact been slightly injured in an earlier accident in 1980 when he attempted to move the antenna in such a way that it made contact with the power line. Representatives of the utility repaired the line and discussed the matter with decedent before re-energizing the line. After this incident, decedent acted carefully, until the fatal accident. We concluded that given these circumstances, the utility company did not breach its duty to decedent:
Applying the negligence balancing process, we conclude that although there was a cognizable risk that the antenna stationed in the corner of Mr. Washington's backyard could be lowered and moved to within a dangerous proximity of the power line, that possibility could not be characterized as an unreasonable risk and the power company's failure to take additional precautions against it was not negligence.
555 So.2d at 1353.
Viewing the progression of cases from Simon to Washington, it becomes clear this court has attempted to fashion the duty of the utility company to an injured plaintiff in terms of a balance between the necessity of uninsulated high voltage power lines and the possibility of severe injury from those lines. In determining the scope of this duty, we have expressly rejected strict or absolute liability approaches. Instead, under a traditional duty-risk analysis, we have focused on whether the utility company knew or should have known its lines created a risk of danger to the plaintiff, and whether the utility company acted reasonably to prevent that harm.
While the cases clearly hold a utility company which realizes its lines present a danger has a high duty to an injured plaintiff, this does not negate the plaintiff's duty to conform to the standard of care that would be exercised by a reasonable man. Dyson v. Gulf Modular Corp., 338 So.2d 1385 (La.1976).
In the present case, the majority has essentially placed LP & L in the position of an insurer, a conclusion we found unacceptable in Simon, supra. Although LP & L realized its lines created a danger to tree trimmers like Dobson, it also knew Dobson *581 had been warned by its service representative of the dangers, had been instructed to contact LP & L whenever he worked around power lines, and had in fact done so it the past. To require LP & L to anticipate Dobson would disregard its warnings is to place an impossible burden on the utility. By contrast, the "burden" on Dobson's part would have been to make one brief telephone call to the LP & L service representative with whom he had dealt with in the past. Clearly, any balance of costs or burdens must weigh in favor of LP & L.
For these reasons, I respectfully dissent from the majority's holding.
MELVIN A. SHORTESS, Justice Pro Tem., dissenting.
I believe that the Court of Appeal correctly assesed the comparative negligence ratio between LP & L and plaintiff. I also note that even a neophyte tree trimmer should have known that the use of a steel-and nylon-made safety line was extremely dangerous, especially when working near electric lines.
I respectfully dissent.

DISSENT ON DENIAL OF REHEARING
HALL, Justice, would grant the defendant's application for rehearing to reconsider the apportionment of fault, agreeing with the dissent of Justice Pro Tempore SHORTESS that the court of appeal correctly assessed the comparative negligence of the decedent and the defendant. The "Hand formula" is a useful tool as is the Watson or Uniform Act list of factors in determining relative degrees of fault, but the majority opinion in this case miscalculates and gives too much weight to the cost side of the formula and reverses the superior-inferior roles of the actors in the immediate events which resulted in this accident.
NOTES
[*] Judge Melvin A. Shortess of the First Circuit Court of Appeal participated in this decision as Associate Justice Pro Tempore.
[1] The Supreme Court of Utah has stated:

"A high tension transmission wire is one of the most dangerous things known to man. Not only is the current deadly, but the danger is hidden away in an innocent looking wire ready at all times to kill or injure anyone who touches it or comes near to it. For the average citizen there is no way of knowing whether the wire is harmless or lethal until it is too late to do anything about it."
See Godesky v. Provo City Corp., 690 P.2d 541, 548 (Utah 1984), quoting, Brigham v. Moon Lake Electric Assoc., 470 P.2d 393, 395 (Utah 1970).
[2] Contrary to Justice Cole's assertion in his dissent, Mr. Cavaretta's testimony is not "uncontradicted"; in addition to being in conflict with other evidence in the record, Mr. Cavaretta's testimony was "self-contradictory". See the following excerpts:

Q: [Y]ou cannot testify that you specifically warned Dwane Dobson or explained to him, any of the hazards in working next to or near the distribution primary voltage lines can you?
A: Sir, I make it a habit, specifically, to warn any tree trimmer of the hazards of electrical power around trees. I've made it a habit ever since I became a service man....
Q: [Y]ou don't remember specifically warning Dwane or explaining to him any of the hazards in working next to or near the distribution primary voltage lines?
A: The only thing that I do remember is that on one of those two occasions that I had a chance to talk to Dwane Dobson, was that the question came up, was that we would not drop primary voltage distribution wires. And I told him in so many words, that it was on a individual basis, as to whether we would drop `em, at that time, or if we would deem it necessary for our peopleour right of way people, to go out and remove these trees to a point that he, or whoever was cutting trees, could remove `em safely. I basically remember that.
* * * * * *
Q: And at page twenty-eight of your deposition, line five: I asked you this question: Did you tell him, explain to him, or warn him of any of the hazards in working next to or near a distribution, primary voltage lines? And your answer on line nine, says: For me to tell you exactly that I did, I can't do that. On a routine basis, when I talked with tree trimmers, I try to make it a habit to warn these people that there is danger, and to be very careful; if they have any problems, please contact us first, so that we can help them as much as we can. Was that the way you answered that questionat your deposition?
A: Yes sir.
* * * * * *
Q: ... when you dropped those two lines the day before he was killed, you don't remember having a conversation with Dwane, and if you did have a conversation with him, you don't remember any part of it, isn't that true?
A: That's true.
* * * * * *
Q: Mr. Cavaretta, you told Dwane Dobson, that generally, you would basically assist him in anyway possible on anything? And you never specifically told him about primary voltage, because you were never ask, or never told that Dwane Dobson was going to work on any primary, or around any primary voltage, and he never ask you about it, Isn't that true?
A: Sir, he did ask me.
Q: You're absolutely sure of that?
A: No Sir, I'm not.
Thus, even though some of Mr. Cavaretta's testimony may be interpreted as indicating that he warned Dobson of the dangers of primary distribution wires, his entire, inconsistent testimony casts serious doubt on such a finding. In no case can it be said that Cavaretta's testimony by itself is a clear indication of the degree of Dobson's knowledge. We believe that the record as a whole indicates that the trial court's inferences and credibility judgments as to Dobson's lack of knowledge were reasonable. Therefore, under the rule of Canter v. Koehring, 283 So.2d 716 (La.1973), the trial court's finding should not be disturbed.
[3] It is obvious that the negligence of Dobson and LP & L were legal causes of the accident; or, to put it differently, that the risk of the electrical accident that happened was within the scope of the duty owed by each. cf. Washington v. Louisiana Power & Light, 555 So.2d 1350 (La.1990); Levi v. SLEMCO, supra. Indeed, the parties have not argued that responsibility should be limited or excused on the basis of a "legal cause" or "duty-risk" theory. The plaintiffs argued that comparative fault principles should not be applied to reduce their recovery relying on Bell v. Jet Wheel Blast, 462 So.2d 166 (La.1985). The reasons for not reducing recovery in Bell, however, are noticeably absent here. Bell, unlike Dobson, was forced by economic circumstances to perform repetitive, monotonous work with a dangerous machine that lacked a required safety device designed to prevent the type of accident that occurred. In contrast, Dobson was free to approach his work with a great deal of autonomy and was a member of a class arguably susceptible to the deterrent effects of recovery reduction. In addition, we do not find that a reduction in recovery by the plaintiffs will drastically reduce LP & L's incentive to make high voltage power lines safer. See also Howard v. Allstate, 520 So.2d 715, 720 (La.1988) (Dennis, J., concurring); Turner v. NOPSI, 476 So.2d 800, 806 (La.1985) (Dennis, J., assigning additional reasons).
[1] Plaintiffs' argument that Coco v. Winston Industries, 341 So.2d 332 (La.1976) is applicable to reductions by appellate courts of comparative fault determinations by the trial court is a res nova issue deserving of attention in this or in similar cases in the future.
[1] The service request and complaint record filed into evidence shows a request to "drop st. light circuit and service line to 114 Sherry Dr., for tree cutter." Decedent's name is on the request, with the date "Tues. 4-23-85 AM." underneath. A second request, dated 4-23-85, reads "has trees cut ready for lines to be put back up, picked up service & secondary back up."
[2] Justice Dennis goes to great lengths to find inconsistencies in Cavaretta's testimony relating to his recollection of his conversation with Dobson. In doing so, the majority misses the clear import of Cavaretta's testimony, which was the lines were dangerous and Dobson understood this. Nonetheless, by focusing Cavaretta's failure to remember verbatim a conversation he had with Dobson, the majority attempts to disregard his testimony as "self-contradictory."

Further, the majority discounts Cavaretta's testimony as giving no clear indication of the degree of Dobson's knowledge. Such a finding ignores the fact Dobson acknowledged Cavaretta's warning by contacting him to drop a service line on the day before his death. Clearly, the inescapable conclusion is that Dobson was properly warned by Cavaretta, realized the lines were dangerous, yet failed to contact LP & L on the day of the accident.
[3] Dewey further testified he warned his brother that his flip line was over the power line and he should move it. The fact that decedent's crew appreciated this danger tends to show decedent knew of it as well.
[4] Simon, supra, involved an injury which resulted when a pipe used in drilling a water well touched a high voltage line, resulting in fatal shocks. The court found the defendant utility warned the father of the owner of the land that the lines were charged and contact with them would be dangerous. The court found this warning, coupled with the fact the lines were placed so their presence was apparent, was sufficient to discharge the utility's duty. In Kent, supra, the injury resulted when a 30 foot long aluminum pole used by an employee to texture a road contacted a high voltage distribution line. The court found the accident resulted from a combination of unusual factors, and that the failure of the utility company to protect against these particular consequences was not unreasonable.
[5] Justices Lemmon and Cole dissented, finding the negligence of the utility company was not a cause in fact of the injury.