610 So.2d 956 (1992)
Scott BLAIR, Individually and on Behalf of the Minor Children Jewell Scott Blair, Jr., Michael Harrison Blair, and Susan Jones Hillhouse
v.
Michael L. TYNES, Norman Tynes, Washington Parish Sheriff's Department, Through Its Sheriff Benny Rayburn, ABC Insurance Company, DEF Insurance Company, GHI Insurance Company, and JKL Insurance Company.
No. CA 91 1846.
Court of Appeal of Louisiana, First Circuit.
November 20, 1992.
Writ Granted February 5, 1993.
*957 Sam Collett, Bogalusa, for Scott Blair.
*958 Donald M. Fendlason, Bogalusa, for MCCA.
H.F. Foster, New Orleans, for American Legion.
Fred Schroeder, Metairie, for Sheriff of Washington Parish.
Steven Lozes, New Orleans, for Michael Tynes.
Before LOTTINGER, C.J., FOIL, J., and COVINGTON[1], J. Pro Tem.
GROVER L. COVINGTON, Judge Pro Tem.
This suit arises out of an accident between a single vehicle and two pedestrians, in which one woman was killed instantly and the other seriously injured. The motorist was a twenty-year old man with two previous DWI convictions, who was found to have been driving with a .16 blood alcohol content, and who failed to yield to traffic control signals of deputies who were directing traffic at the time. He struck the two women who were crossing the road after leaving the American Legion Home in Bogalusa, where they had been attending a function held by a Mardi Gras krewe, Krewe of MCCA, Inc.
The husband of the deceased woman, Scott Blair, filed suit on behalf of himself and of the two minor children of the marriage, one of whom was only eleven weeks old at the time of Mrs. Blair's death. Joined with him as a plaintiff was the woman who was injured in the accident, Susan Jones Hillhouse, the decedent's sister, who sought damages for her own injuries. In addition to naming the driver, Michael Tynes, and his father, Norman Tynes, whose truck he was driving at the time, and their insurers as defendants, the plaintiffs also asserted claims against the Krewe of MCCA, Inc., the American Legion Magic City Post No. 24 and its insurer, Scottsdale Insurance Company, and the Washington Parish Sheriff's Department, through its Sheriff, Benny Rayburn.
After a bench trial, the district court rendered judgment in favor of the plaintiffs, finding liability on the part of all defendants named except for the Krewe of MCCA, Inc., and Norman Tynes; the latter was dismissed after his insurer tendered policy limits plus interest. The trial judge found the decedent, Theresa Blair, and her sister each to be 15 percent at fault in the accident; defendant driver, Michael Tynes, was found to be 50 percent at fault; the Washington Parish Sheriff's office was assessed with 25 percent fault for the actions of its employees; and the American Legion, owner and lessor of the facilities at which the two women attended the function, was allocated 10 percent fault.
Damages were awarded to plaintiff Scott Blair for the wrongful death of his wife in amount of $250,000.00, and on behalf of the children in the amount of $125,000.00 each. He was also awarded $100,000.00 for mental distress damages as a result of witnessing his wife's death; $124,423.00 in damages for his wife's earning loss; and $4,516.61 in funeral expenses, for a total of $728,939.61, together with interest and costs. Additionally, he and his children were awarded punitive damages against Michael Tynes in the amount of $50,000.00 together with interest.
Plaintiff Susan Jones Hillhouse was awarded general damages in the amount of $85,000.00, medical expenses in the amount of $27,459.96, and lost wages in the amount of $9,532.00, for a total of $121,991.96, together with interest and costs. She also was awarded punitive damages against Michael Tynes in the amount of $25,000.00, together with interest.
Numerous third party demands and cross- and counter-claims filed by the defendants were rejected by the trial court, which ruled that the defendants were liable in solido, up to 50 percent of the recoverable damages to each set of plaintiffs, and reserved their respective rights of contribution, except as to the liability of the American Legion and its insurer, which was limited *959 to 10 percent of the recoverable damages.
The plaintiffs and all defendants cast in judgment appealed, arguing numerous assignments of error. We will address herein only those assignments of error which we have determined have merit. For the reasons hereinafter stated, we reverse in part, amend in part, and affirm in part.

LIABILITY OF AMERICAN LEGION POST NO. 24
The trial court found liability on the part of the American Legion, based on its action in requiring and obtaining deputies to direct traffic for all functions for which it leased its premises, including this function, but without obtaining a sufficient number of deputies or ensuring that they had implemented a traffic control plan which included assistance to pedestrians crossing the highway after leaving the American Legion Hall.
The facilities owned and leased by the American Legion to the Krewe of MCCA, Inc., were located along Highway 10 in Bogalusa immediately adjacent to the Pearl River. The facilities, which were large enough to accommodate crowds of 700 people, were serviced by two parking lots, a north lot immediately in front of the building complex, between the buildings and Highway 10, and a south lot, which was on the opposite side of the highway. Thus, guests using the south lot were required to cross Highway 10 either to enter the facilities or to reach their cars. In leasing its premises to the public, the American Legion required that lessees pay for the services of one sheriff's deputy per one hundred guests to direct parking and traffic entering and travelling upon Highway 10. The American Legion, pursuant to each lease, was responsible for contacting the Washington Parish Sheriff's Office and obtaining the necessary deputies. Each time the premises were leased for a public function, the facilities manager, David Rester, would contact Deputy Luther (Luke) Miley of the Washington Parish Sheriff's Office, who would then obtain the desired number of off-duty deputies to control traffic for the function.
On the night in question, five hundred guests were expected; therefore, the number of deputies requested by Mr. Rester was five. These five men, who had all worked in such fashion at the American Legion site in the past, had stationed themselves strategically to observe and control traffic coming from the east over the Pearl River Bridge (Mississippi), and from the west out of Bogalusa, and to assist vehicles in both parking lots. One deputy was standing in the middle of Highway 10, two were at either side of the highway on the north and south shoulders, respectively, and two were in the north parking lot. A marked sheriff's unit with its lights flashing was parked directly in front of the building complex near the north shoulder to alert traffic; and all deputies had flash lights with orange night wands to signal traffic.
Testimony was clear that the American Legion had never, in any fashion, attempted to control the manner in which the deputies exercised traffic control. There had never been any previous complaints about the number of deputies which the American Legion's policy requested, or the manner in which the deputies performed their functions; nor had there ever been an accident involving a pedestrian there before. As Mr. Rester testified, all the members of the American Legion were lay people who would have been unable to tell the deputies how to perform their jobs as police officers and traffic controllers. Although Deputy Miley indicated initially in his testimony that he felt the deputies owed a duty to the pedestrians as well as to the motorists, he admitted that it would have been impossible to channel all pedestrians leaving the facilities into a specific "corridor" across the highway, because they simply wouldn't cooperate.
The trial judge's finding of liability appears to be predicated upon Mr. Blair's and Deputy Miley's testimony. In his reasons for judgment he stated, "... [W]hen a landowner has undertaken an affirmative duty such as the Legion did in this case, *960 the landowner has an obligation to perform that duty in a non-negligent manner." While this is a correct statement of law, it was error to apply this law to the circumstances of this case. Here, the effect of an application of this principal would be to require untrained, unlicensed lay persons to direct the performance of the job functions of licensed professionals. Whether those professionals were regular or auxiliary deputies, or whether the training in traffic control procedures was obtained through formal seminars or on-the-job training, does not alter the posture of these respective defendants with regard to each other.
We find merit in this assignment of error, and reverse that portion of the judgment finding American Legion Post No. 24 liable.

LIABILITY OF THE SHERIFF'S DEPARTMENT
As noted by the trial court in its reasons for judgment, there was no expert testimony presented on the adequacy or inadequacies of the deputies' performance of their duties on the night in question.
The record indicates that at least two of the deputies, and possibly three, were signalling to the Tynes vehicle to stop, but that Michael Tynes, who knew that an event was occurring that evening at the American Legion facilities, did not stop, and did not even attempt to apply his brakes prior to the impact with Theresa Blair and Susan Jones Hillhouse. Deputy Kenneth Stewart, who was positioned in the center of the road, testified that he began hollering when it became obvious that the vehicle was not slowing down, and that he checked the parking lot to make certain that no vehicle was attempting to exit, but that he did not note any pedestrians crossing the road. Likewise, the other two deputies positioned near the shoulders of the road indicated that they ascertained that no vehicles were attempting to leave the parking lots and enter the road, but did not note any pedestrians.
The trial judge, while accepting that the deputies could not have stopped a vehicle whose driver was unwilling to stop, found that the deputies were nevertheless negligent on two other bases. He stated that "the deputies were negligent in not formalizing a proper plan to control traffic and assist pedestrians across this highway." He found that Deputy Miley had a duty to request from the American Legion authority to hire more deputies in order to assist pedestrians, based on a statement by Miley that the number of deputies there could not have efficiently directed traffic and have overseen all pedestrians. [However, the deputies could and would assist any pedestrians who asked for help.]
The court also found that the deputies were negligent in failing to warn the pedestrians of the danger of the oncoming vehicle.
Plaintiff Susan Jones Hillhouse, who had accompanied her sister, the decedent, and the decedent's husband, plaintiff Scott Blair, to the function at the American Legion Home, testified that she had no memory of the events that night after walking out of the building complex. Scott Blair testified that he assumed that the deputies directing traffic that night were halting traffic for pedestrians to cross the road, although he did not actually see them doing so. When he and the two women left the American Legion complex and began to cross the road, he was in the lead and the two women were following him and talking as they crossed the road. He testified that he saw the oncoming pickup truck driven by defendant Michael Tynes as he was approximately in the center of the road, that he saw the deputies waving the vehicle to stop and assumed it would do so, so he continued crossing the road and didn't look back at the vehicle again. As he reached the shoulder on the south side of the highway, he heard the engine of the truck and looked back in time to see it strike his wife and sister-in-law. At trial, Mr. Blair emphasized that all of them assumed the deputies were regulating traffic for the pedestrians crossing the road, and that because they felt safe, they didn't hurry off the road when they first saw the Tynes vehicle coming. He claimed that the accident *961 would not have happened had the deputies not been there: "We would have hurried off the road rather than depending on the deputies to be our safety shield."
Since neither victim of the accident could testify regarding the sequence of events, we are left with the assumptions that either they never looked for oncoming traffic on the straight, level highway, or that, like Scott Blair, the two women did see the Tynes vehicle approaching but deemed themselves safe on the assumption that it would stop pursuant to the deputies' signals.
We find that under the circumstances of this case, the trial court was in error in assigning a duty to the Sheriff's Office to request more deputies to form a pedestrian guard, as in the manner of school-crossing guards escorting schoolchildren. The record is clear that the members of the public attending the Mardi Gras krewe's function, a Las Vegas night fundraiser, were adults. There was no basis in the record for imposing a duty on the sheriff's deputies to the adult pedestrians who were crossing the road. The deputies were clearly required in order to control vehicular traffic. Any highway is dangerous to cross for an adult who does not observe oncoming traffic. The presence of law enforcement officers to control vehicular traffic and parking does not relieve a pedestrian of the statutory obligation to yield to vehicles on the roadway. LSA-R.S. 32:213.
Nor does the record support the finding that the sheriff's deputies failed to warn pedestrians of the oncoming vehicle. The three deputies on the roadway and shoulders, as well as Scott Blair, confirmed that when it became obvious that the Tynes vehicle was not going to obey the signals to stop, Deputy Stewart began hollering. He could not have given warning prior to the realization that the vehicle was not going to stop; having given warning at the first opportunity, neither he nor the other deputies may be held liable for the failure of pedestrians to hear the warning, or their failure or inability to react to the warning in time.
We find that the record does not support any legal basis for liability on the part of the Sheriff's Office. We therefore reverse that portion of the trial court's judgment holding the Sheriff's Office liable.
This assignment of error has merit.

ALLOCATION OF FAULT
Our rulings above require that we reexamine the allocation of fault between the remaining parties found liable, defendant Michael Tynes, and plaintiff Susan Jones Hillhouse and the decedent, Theresa Blair.
Michael Tynes did not testify at trial; his testimony was offered via deposition. In it, he stated that he had passed along Highway 10 in front of the American Legion complex earlier that night and had seen the sheriff's deputies, and knew that there was some kind of function that evening. He went to a bar with some friends although he knew he was under the legal age for drinking, and had four twelve-ounce beers and two shots of a mixed drink called a Kamikaze in just under three hours. Tynes admitted seeing one deputy waving his wand prior to the impact, but saw no need to stop. He told one deputy after the accident that he had just wanted to get home. Blood alcohol testing revealed a blood alcohol level of .16; this was his third DWI offense.
On cross-examination, he admitted that he was concerned about getting another DWI charge if he stopped, and that rather than slowing down, he was driving over the speed limit. Tynes claimed that the two pedestrians jumped out in front of him from between two cars immediately before impact, and that he had almost no time to react.
As previously stated, the only testimony regarding the movements of the two women immediately prior to the accident was that of the decedent's husband, Scott Blair. Both he and Ms. Hillhouse testified that Theresa was not a frequent drinker, but that she did have some alcohol to drink that night. Neither one knew the quantity. Mr. Blair denied that his wife showed any sign of intoxication or impairment prior to the accident. The most significant testimony *962 he gave regarding the two women's last actions prior to the impact was that they were walking behind him, probably side by side, and that he could hear them talking to each other behind him as they all began crossing the road. Although he saw the approaching vehicle when he was approximately in the center of the roadway, he gave it no further attention and assumed it would stop according to the deputies' signals.
We have no way of knowing whether the two women acted in precisely the same fashion, or whether they even ascertained the traffic conditions when they continued behind Mr. Blair across the roadway. It is just as plausible that the two unfortunate sisters, who were busy talking as they "followed the leader," never looked at the roadway, as that they saw the vehicle and assumed that it would stop, without continuing to watch it as they crossed the highway. Since Blair's testimony was that he had just reached the shoulder and safety when he heard the motor of the truck and looked back to see the impact, we may assume that very little time elapsed between his initial sighting of the Tynes vehicle and the impact.
In either event, we find that the decedent and her sister were partially at fault in the accident, and that the responsibility for their safety in crossing a highway which plaintiffs themselves knew was dangerous, may not be delegated wholly to other actors. There are no special circumstances present in this admittedly tragic case which warrant such treatment of these two capable adults.
In assessing the percentage of fault of Tynes, Blair, and Hillhouse, we are guided by the dictates of our supreme court in Dobson v. Louisiana Power & Light Company, 567 So.2d 569 (La.1990). There, the court adopted the "Hand formula" or "Learned Hand test," to help determine the degree or percentage of negligence attributable to a person under LSA-C.C. art. 2323.
The amount of caution `demanded of a person by an occasion is the resultant of three factors: the likelihood that his conduct will injure others, taken with the seriousness of the injury if it happens, and balanced against the interest which he must sacrifice, or the cost of the precaution he must take, to avoid the risk.' If the product of the likelihood of injury multiplied times the seriousness of the injury exceeds the burden of the precautions, the risk is unreasonable and the failure to take precautions or sacrifice the interest is negligence. (Citations omitted.)
567 So.2d at 574-575.
The court indicated that this formula was to be used along with the factors taken from the Uniform Comparative Fault Act, as discussed in Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985). These factors are: (1) whether the conduct was mere inadvertence or engaged in with an awareness of the danger involved, (2) the magnitude of the risk created by the conduct, including the number of persons endangered and the potential seriousness of the injury, (3) the significance of what the actor was seeking to attain by his conduct, (4) the actor's superior or inferior capacities, and (5) the particular circumstances, such as the existence of an emergency requiring a hasty decision. As the Dobson court noted, "The Hand formula, or balancing process, moreover, helps to `center attention upon which one of the factors may be determinative in any given situation.'"
Consideration of these factors mandates a greater assessment of fault to Michael Tynes than to the two women. He knew that the American Legion facilities were being used for a function and that guests would be moving across the highway, he knew that the deputies were directing traffic, he was seeking to avoid the consequences of his own illegal actions and a further DWI charge, and his capacity for injury to others while driving a motor vehicle when he was legally intoxicated was great.
In contrast, the actions of the two women, while careless as to their own safety, did not pose the serious threat of harm to others that Tynes' actions did. Although *963 we do not condone their failure to ascertain traffic conditions at the time they crossed the road, their behavior was more inadvertent than deliberate, and was not in flagrant disregard of the danger of the situation in the manner of Tynes' refusal to obey the signals of the deputies.
We assess Michael Tynes' degree of fault for this accident at 75 percent, and Theresa Blair and Susan Jones Hillhouse each with 25 percent fault for their own injuries.

MENTAL ANGUISH DAMAGES
In addition to the general damages awarded, the trial court awarded $100,000.00 in damages to Mr. Blair under Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990), for his emotional distress and mental anguish resulting from seeing his wife struck by the Tynes vehicle.
The restrictions placed by the supreme court on the recovery of such damages are as follows: (1) A claimant must either view the accident or injury-causing event or come upon the accident scene soon thereafter and before substantial change has occurred in the victim's condition. (2) The direct victim of the traumatic injury must suffer such harm that it can reasonably be expected that one in the plaintiff's position would suffer serious mental anguish from the experience. (3) The emotional distress sustained must be both serious and reasonably foreseeable to allow recovery. A non-exhaustive list of examples of serious emotional distress includes neuroses, psychoses, chronic depression, phobia and shock. (4) The relationship between the claimant and the victim must be such as to make the causal connection between the defendant's conduct and the harm suffered understandable. See, 556 So.2d at 570.
There is no question that Mr. Blair would be entitled to such an award under the proper presentation of proof. He viewed the impact of the truck that caused the death of his wife, saw her body dragged some distance under the truck, and was the first person to reach her after the accident. Certainly these events meet the criteria established in Lejeune: he viewed the incident, his wife's resulting death could reasonably be expected to cause him to suffer serious mental anguish, and the relationship between the victim and the claimant is among those recognized by our supreme court as among the permissible categories. However, where this claimant fails is in proof of "severe and debilitating" emotional injury, further described by the Lejeune court in the following manner:
For instance, Paugh v. Hanks, 6 Ohio St.3d 72, 451 N.E.2d 759, 765 (1983) held that `serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case.' A non-exhaustive list of examples of serious emotional distress includes neuroses, psychoses, chronic depression, phobia and shock. (Citations omitted.)
556 So.2d at 570.
The most telling testimony about the effect of his wife's death on Scott Blair concerned his lack of a social life and focus on his children. Although he testified that he was not working three years after the accident, his testimony was that he could not find a satisfactory job that would allow him to take care of the childrena problem faced by many single parentsnot that he was psychologically unable to work. Likewise, his testimony regarding how his life has been changed was: "Well, I had to totally forget the way I was living and start all over.... I gave up all ambitions, happiness, had to learn how to wash, cook, take care of babies, you know, things like that, to do it all."
While the circumstances of this case are tragic, we cannot say that plaintiff supported his burden of proof with regard to having sustained a severe and debilitating emotional injury. The description given by Mr. Blair of the changes in his life pattern in many ways parallels the lives of millions of single parents who have not suffered the death of a spouse under these conditions. Although his grief at his wife's death was very apparent throughout his testimony and that of friends and family *964 members, the evidence and testimony offered fell far short of the type of emotional distress required by Lejeune. Since plaintiff did not sustain his burden of proof, it was error for the trial court to award these damages.
We therefore reverse that portion of the judgment awarding mental distress damages to the plaintiff.

CONCLUSION
For the above reasons, we reverse that portion of the judgment finding the Washington Parish Sheriff's Office and the American Legion Magic City Post No. 24 liable. We also reverse the award to plaintiff Scott Blair of $100,000.00 in mental anguish damages, reducing the amount of his individual damages from $478,939.61 to $378,939.61. We increase the percentage of fault assessed to defendant Michael Tynes to 75 percent for the injuries to Susan Jones Hillhouse and 75 percent for the death of Theresa Blair. We also increase the percentage of fault assessed against Hillhouse to 25 percent and against Blair to 25 percent, and order that damages awarded herein to Hillhouse and to Scott Blair individually and on behalf of the minor children each be reduced by the 25 percent fault assessed herein. We affirm the award of punitive damages in the amount of $100,000.00 in favor of Scott Blair individually and on behalf of his children and against Michael Tynes. We affirm the award of damages in the amount of $121,991.96 in favor of Susan Jones Hillhouse. We affirm the award of punitive damages in the amount of $25,000.00 in favor of Susan Jones Hillhouse and against Michael Tynes. We affirm the dismissal of all other claims by and between the parties.
Costs of this appeal are to be divided between appellants Tynes, Blair, and Hillhouse in proportion to the fault assessed each herein.
AFFIRMED IN PART, REVERSED IN PART, AMENDED IN PART, AND RENDERED.
NOTES
[1] Judge Grover L. Covington, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.