689 So.2d 696 (1997)
Lawrence and Marie TRAHAN, Plaintiffs-Appellants,
v.
Dr. Robert McMANUS and St. Paul Fire and Marine Insurance, Defendants-Appellees.
No. 96-669.
Court of Appeal of Louisiana, Third Circuit.
February 19, 1997.
Rehearing Denied April 8, 1997.
*698 J. Minos Simon, Lafayette, for Lawrence Trahan and Marie Trahan.
Joel Edward Gooch, Lafayette, for Dr. Robert McManus, M.D., et al.
Before WOODARD, DECUIR, PETERS, AMY and SULLIVAN, JJ.
WOODARD, Judge.
Lawrence and Marie Trahan, the parents of a 36-year-old man who died after he was mistakenly discharged from the hospital after being involved in an auto accident, brought suit against the doctor who ordered the discharge. The jury denied plaintiffs' relief. We reverse and award each plaintiff $100,000.00 in damages plus interest and costs.

FACTS
On August 17, 1991, Terry Trahan, 36, was taken to American Legion Hospital, in Crowley, Louisiana after being injured in a single-vehicle automobile accident. The hospital called Lawrence and Marie Trahan, Terry's *699 parents, to inform them of the accident and to request that they come to the hospital to retrieve their son. Terry Trahan was living with his parents at the time of the accident. The family had a very close and loving relationship. After being informed of the accident, Mrs. Trahan drove to the hospital's emergency room. Although Terry had been attended to and had received bandages and stitches, Mrs. Trahan noticed that her son appeared to be in pain. Mrs. Trahan consulted with Dr. McManus, the emergency room physician who treated Terry. McManus assured Mrs. Trahan that it would be all right to take her son home as there was nothing more that could be done for him at the hospital. McManus advised Mrs. Trahan to put Terry to bed and to see that he got lots of rest.
Upon ordering the discharge, however, McManus had not realized that he had made a grave and ultimately fatal mistake. McManus had looked at the wrong chart in determining Terry's status and consequently was ignorant of Terry's true condition. First, Terry had three broken ribs as a result of the accident. This injury was not diagnosed although x-rays were taken. Second, the chart McManus had looked at indicated that the patient's vital signs were normal. In fact, Terry's blood pressure was 90/60, indicative of shock, when he was admitted to the hospital. Forty-five minutes after being admitted, Terry's blood pressure had dropped to 80/50 and his respiration rate had doubled. Terry's vital signs clearly indicated that he was suffering from internal hemorrhaging.
After being discharged from the hospital, Terry Trahan had to be helped from the wheelchair into Mrs. Trahan's pickup truck. During the drive home, he continuously slumped over onto Mrs. Trahan as she was driving. Upon arrival at the Trahan home, Mr. Trahan greeted the vehicle in the driveway. He and his wife helped their son into the house and to bed. In the seven hours following his discharge, Terry's condition continued to worsen. Terry complained to his parents about severe pain. He could not turn from his back to his side without the aid of his father. Throughout this ordeal, Lawrence Trahan attempted unsuccessfully to ease his son's pain by massaging his back.
Several hours after being brought home from the hospital, Lawrence Trahan noticed that Terry's abdomen was swelling. Marie Trahan immediately called the hospital. While Mrs. Trahan was on the telephone, Mr. Trahan again attempted to ease his son's pain. Mr. Trahan asked Terry if he wanted to sit up. Terry replied, "Well, we can try." Those were Terry's final words. Terry slumped in his father's arms and his head fell forward. When Mr. Trahan attempted to lift Terry's head, Terry's face was white. Mr. Trahan immediately laid his son down on the bed realizing for the first time that his son was not breathing and had no pulse. Mr. Trahan attempted CPR as Mrs. Trahan called for an ambulance. Mr. Trahan continued CPR until the ambulance arrived a few minutes later. Terry Trahan was pronounced dead on arrival at the hospital.
Subsequently, during the medical review panel proceeding in which the Trahans participated, McManus admitted liability to the wife and child of Terry Trahan, by tendering his $100,000.00 limit of liability, pursuant to the Medical Malpractice Act.
On March 12, 1993, the Trahans filed their own claim against McManus, pursuant to La. Civ.Code art. 2315.6. Subsequently, McManus filed exceptions of no right and no cause of action, claiming that La.Civ.Code art. 2315.6 remedies are not available to the parents when a decedent is survived by a spouse and child. Alternatively, McManus contended that the parents did not witness the event causing the injury and therefore, were not entitled to recovery under the statute. On November 19, 1993, the trial judge granted defendants' exception of no right and no cause of action. On March 22, 1995, we reversed the trial court's judgment and remanded for trial on the merits. Trahan v. McManus, 94-167 (La.App. 3 Cir. 3/22/95); 653 So.2d 89, cert. denied, 95-1018 (La.6/2/95); 654 So.2d 1112.
Following the remand of this action, trial was held on March 12 and 13, 1996. A twelve-person jury returned a verdict absolving McManus of any liability, finding that Terry Trahan's injuries would have occurred *700 despite McManus' failure to use reasonable care in his treatment of Terry Trahan. It is from the judgment entered on March 25, 1996, implementing the jury's verdict, that the Trahan's bring this second appeal.

ASSIGNMENTS OF ERROR
The Trahans claim the following assignments of error:
1. The trial court erred in charging the jury with instructions drawn verbatim from La.R.S. 9:2794, the statute setting forth the burden of proof which must be carried by a plaintiff in a medical malpractice action, because:
(a) The Trahans' claim for damages for emotional distress for injury to their son did not constitute a medical malpractice action; and,
(b) Louisiana Civil Code article 2315.6(B) explicitly provides that article 2315.6 is the exclusive means by which the damages claimed by the Trahans in this lawsuit can be recovered.
2. The trial court thereby erred in failing to instruct the jury that there can be more than one cause of an injury sufficient to make the negligence of a tortfeasor actionable.
3. The jury, and thereby the trial court in implementing the jury's verdict, erred in failing to conclude that plaintiffs proved that Dr. McManus' conduct was a cause in fact of Terry Trahan's death.
4. The jury, and thereby the trial court in implementing the jury's verdict, erred in failing to make an award of damages to plaintiffs.

LAW

MANIFEST ERROR
It is well-settled that an appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless they are clearly wrong. Stobart v. State, through DOTD, 617 So.2d 880 (La.1993) (citing Rosell v. ESCO, 549 So.2d 840 (La.1989)). In Stobart, the Louisiana Supreme Court established a two-part test which must be satisfied before an appellate court can reverse a fact-finders determination:
(1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
(2) The appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
Id. at 882. The test requires an appellate court to do more than simply review the record for evidence that validates or disproves the factual findings of the trial court. Id. (citing Mart v. Hill, 505 So.2d 1120 (La.1987)). The test demands that the reviewing court scrutinize the record in its entirety to determine whether the trial court's findings of fact were clearly wrong or manifestly erroneous. Id.; Evans v. Tudor Constr., 95-1029 (La.App. 3 Cir. 1/31/96); 670 So.2d 447. As this Court recently stated in Evans:
To reverse the judge or jury on its finding of fact, we must both find, after a review of the record in its entirety, that there is no factual basis for its finding, and that the finding is clearly wrong or manifestly erroneous. The issue is not whether the judge or jury is right or wrong; it is whether the conclusion was reasonable.
670 So.2d at 450 (citing Stobart, 617 So.2d 880). A trial court's reasonable determinations and inferences of fact are not to be disturbed solely because a reviewing court may feel that its own evaluations are more reasonable than those of the factfinder. Stobart, 617 So.2d 880, (citing Rosell, supra; Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978)).
This well-settled standard of review stems from the trial court's unique opportunity to evaluate live witnesses and on the proper allocation of trial and appellate functions between the respective courts. Evans, 670 So.2d 447, (citing Stobart, 617 So.2d 880). While the trial court is in a better position to evaluate and assess the credibility of witnesses, the overriding determination for the court of appeal is whether these determinations are reasonable. Id. Where there are two permissible views of the evidence, the *701 fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989); Law v. City of Eunice, 94-1312 (La.App. 3 Cir. 4/5/95); 653 So.2d 149. We shall first consider Assignments of Error 3 and 4, as the determination of these issues will prove dispositive of the case before us.

TRAHAN I
This case was first brought before us on appeal in Trahan v. McManus, 94-167 (La. App. 3 Cir. 3/22/95); 653 So.2d 89, cert. denied, 95-1018 (La.6/2/95); 654 So.2d 1112 [hereinafter Trahan I.] Our review in Trahan I was limited to determining whether the trial court erred in granting defendants' exceptions of no cause and no right of action. The principle issue on review was whether the father and mother of Terry Trahan could recover damages under La.Civ.Code art. 2315.6 for their allegedly debilitating mental anguish and emotional distress which resulted from their son's death. Article 2315.6 states:
A. The following persons who view an event causing injury to another person, or who come upon the scene of the event soon thereafter, may recover damages for mental anguish or emotional distress that they suffer as a result of the other person's injury:
(1) The spouse, child or children, and grandchild or grandchildren of the injured person, or either the spouse, the child or children, or the grandchild or grandchildren of the injured person.
(2) The father and mother of the injured person, or either of them.
(3) The brothers and sisters of the injured person or any of them.
(4) The grandfather and grandmother of the injured person, or either of them.
B. To recover for mental anguish or emotional distress under this Article, the injured person must suffer such harm that one can reasonably expect a person in the claimant's position to suffer serious mental anguish or emotional distress from the experience, and the claimant's mental anguish or emotional distress must be severe, debilitating, and foreseeable. Damages suffered as a result of mental anguish or emotional distress for injury to another shall be recovered only in accordance with this Article.
The most difficult question presented by the controversy was whether the Trahans had satisfied the prerequisites of subsection (A) of the statute: Had the Trahans actually viewed the event causing injury to Terry, or had they come upon the scene of the event soon thereafter? Before we could answer the question, however, we first had to determine the actual event that caused Terry's injury and ultimate death. We came to the following conclusions:
In this case, because the "event causing injury" was the physician's admittedly negligent discharge of the decedent, there can be no question that the mother is among the classes for whom LSA-C.C. art. 2315.6(A) was intended. After all, she viewed her son's negligent discharge, and that, according to all of the parties, is the event that caused his injury. We reject defendant's contention that the mother cannot recover under LSA-C.C. art. 2315.6 solely on the basis of her not having witnessed the auto accident which landed her son in the hospital. Because she alleges severe and debilitating anguish caused by witnessing her son's discharge, Ms. Trahan clearly has stated a cause of action under LSA-C.C. art. 2315.6(B)....
Although the claim of the father is somewhat different, we feel he also has stated a cause of action under LSA-C.C. 2315.6. We hold that the father, who did not merely learn of the accident from others, too has stated an actionable claim for the reasons expressed [above]. This is because we see no basis for distinguishing the claim of a grief-stricken mother who viewed the "event causing injury," from that of a father upon whom the continuing event was visited almost instantaneously; for he too is a listed beneficiary of LSA-C.C. art. 2315.6(A)(2) and like the mother, was compelled... to witness the final seven hours of his son's life as it dimmed, flickered, then expired.
Id. at 92 (citations omitted) (emphasis added). As stated above, it was conceded by all *702 parties that Terry's ultimate death was due to the negligent discharge by McManus. Therefore, because we determined the event that caused Terry's death was McManus' negligent discharge of Terry, and that both Lawrence and Marie Trahan had viewed that event, we held that they had a valid cause of action under La.Civ.Code art. 2315.6. We reversed the judgment granting the defendants' exceptions and remanded for a trial on the merits.

CAUSE-IN-FACT
In their third assignment of error, the Trahans contend that the jury erred in its determination that McManus' act of negligently discharging Terry Trahan was not the cause-in-fact of his death. After trial by jury on March 12 and 13, 1996, the jury returned the following verdict pursuant to an interrogatory which read as follows, in pertinent part:
1. Do you find, from a preponderance of the evidence that Dr. Robert McManus failed to use reasonable care and diligence, along with his best judgment, in his treatment of Terry Trahan?
 Yes √ No __________
If your answer to Question No. 1 is no, then the jury foreman should date and sign this jury form and inform the bailiff that a verdict has been reached. If your answer to Question No. 1 is yes, then proceed to Question No. 2.
2. Do you find, from a preponderance of the evidence, that as a result of the failure by Dr. Robert McManus to exercise reasonable care and diligence and his best judgment in treating Terry Trahan, that Terry Trahan suffered injury that would not otherwise have been incurred?
 Yes __________ No √ 
If your answer to Question No. 2 is no, then the jury foreman should date and sign this jury form and inform the bailiff that a verdict has been reached. If your answer to Question No. 2 is yes, then proceed to Question No. 3.
At the trial on the merits, however, there was complete agreement among the litigants that Terry's ultimate death was due to the negligent discharge by McManus. This consensus is evidenced by the following excerpt from Dr. McManus' cross-examination at trial:
Q. Now then, if you had looked at the right chartif you had looked at Mr. Trahan's chart when you were talking to him, there's no doubt in your mind that you would not have told him to leave, is that correct?
A. No, sir. And I've stated this before.
Q. All right. It's a double negative when you say "No, sir." You ought to say, "There's no doubt in my mind that had I looked at Mr. Trahan's chart, I would not have let him leave the hospital." Is that right?
A. I'll restate that by saying I would not have let him leave.
Q. But did you not voluntarily determine no doubt that you would not have let him leave?
A. Yes, sir.
Q. Now, there's a reason there was no doubt that you would [sic] let him leave, is because after you read his chart, you found that he never should have left, because of his condition, is that correct?
A. That's correct.
Later in his testimony, McManus discussed the two reasons he would not have released Terry Trahan from the hospital; namely, the patient's sharp drop in blood pressure coupled with a sharp increase in respiration. These symptoms had been duly noted on Terry Trahan's chart. McManus testified that he had not seen these notations because he had looked at someone else's chart. McManus later stated that Terry Trahan's symptoms indicated hypovolemic shock or a decrease of blood volume. His cross-examination continued as follows:
Q. Is there a treatment available, if you see a person in an unstable condition with a dropping blood pressure? There's some treatment available, is there?
A. Yes, sir. I think Dr. West alluded to that yesterday, when he said the first thing he would do would give [sic] *703 them colloids ... a solution routinely of salt and water to increase the ... total blood volume....
* * *
Q. All right. Doctor, what would you have done, Doctor, you would have given some fluid. Would you have consulted a vascular surgeon?
A. Since we don't have on one our staff, I would have probably asked one of the two (2) surgeons that we had to evaluate him, to start with. Basically, if it looked like this was something that they could take care of, then I would certainly follow their suggestions. If they suggested because of continued [sic] to diminish blood pressure, and they didn't feel they could handle this, then we would have consulted someone in Lafayette.
Q. I mean, this is not news. It's not a new thing to you. You had similar problems involving other patients where you needed a vascular surgeon to try to save this guy's life, and you did that, is that right?
A. Yes, sir.
Q. So, as far as you were concerned, you would have engaged in all those activities, to try to stop thisfind out what blood loss, where the blood loss was, is that correct?
A. Yes, sir. I think I've stated that before.
Q. So, you had either the American Legion Hospital, Lafayette General Hospital, and those hospitals around Lafayette, they have the diagnostic tools to, you know, given a case like this, they can check to find out if there's internal bleeding, where it is, and then, make exploratory surgeries, if you have to. Puts the needle in the belly to find out if there's blood in the cavity, things of that sort, is that right? Those things are available?
A. Yes, sir.
Q. These are some of the things that you would have done, had you not made the mistake of reading the wrong chart, and knowing what you saw on Mr. Trahan's chart, is that correct?
A. Yes, sir.
Q. So, with modern medicine, and all the technology that we have today, that type of condition, if probably [sic] cared for, you'd reasonably expect that this guy's life could be saved. There would be a good chance to be saved, is that right?
A. I think there's a chance. I don't think that I could basically say that his life would have been saved, but there was a chance.
Q. But as a reasonable medical probability, if you had applied yourself, and applied the technology and the diagnostic tools to locate this and control this, as a reasonable medical probability, you would say this man's life could have been saved?
A. Yes, sir.
Q. Now, as far as you're concerned, Doctor, this person, Mr. Trahan, as you stated earlier, was an otherwise healthy person. So, the cause of this death was a loss of blood that resulted from lack of attention, is that correct?
A. Yes, sir. That is what was stated yesterday by the pathologist.
In the autopsy report, the pathologist, in fact, concluded that Terry Trahan's death was due to hypovolemic shock secondary to massive intra-abdominal and retroperitoneal hemorrhage. According to the pathologist, Terry Trahan was an otherwise healthy 36-year old male.
The primary inquiry in determining negligence on the part of a defendant is whether any causal connection exists between the harm to the plaintiff and the defendant's negligent conduct. Kramer v. Continental Cas. Co., 92-1131 (La.App. 3 Cir. 6/22/94); 641 So.2d 557, cert. denied, 94-2474, 94-2475 (La.12/19/94); 648 So.2d 403 (citing Hill v. Lundin and Assoc., Inc., 260 La. 542, 256 So.2d 620 (1972)). In reaching this determination, the defendant's conduct need not be the sole cause of the harm, but must be a necessary antecedent to the harm suffered. St. Hill v. Tabor, 542 So.2d 499, 501-02 *704 (La.1989), reh'g. granted, 549 So.2d 870 (La.1989) (citations omitted); Hasha v. Calcasieu Parish Police Jury, 94-705 (La.App. 3 Cir. 2/15/95); 651 So.2d 865, cert. denied, 95-667 (La.4/28/95); 653 So.2d 592. Put simply, if the plaintiff can show he probably would not have suffered damages absent the defendant's conduct, he has satisfied his burden of proving cause-in-fact. Id. In Hasha, we stated:
Causation must be proven by a preponderance of the evidence. "Negligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm...."
651 So.2d at 874 (citing Townsend v. State Through Dept. of Highways, 322 So.2d 139 (La.1975); Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298, 302 (1962)). A party's negligent conduct is undoubtedly a substantial factor in bringing about an injury if the injury would not have occurred without it. Id. If the injury would have occurred irrespective of the negligent act, then the negligent act was not a substantial factor or cause-in-fact of the injury. Id.
In Ganey v. Beatty, 391 So.2d 545, 547 (La.App. 3 Cir.1980), cert. denied, 396 So.2d 1325 (La.1981), we stated:
To determine cause-in-fact, courts will carefully scrutinize all the evidence, and those acts will be adjudged causes-in-fact when it is found that more probably than not they were necessary ingredients of the accident. Stated otherwise, an act will be deemed a cause-in-fact of an accident only when, viewed in the light of all the evidence, it is concluded that it is a substantial factor without which the accident would not have happened.
In other words, to be a cause-in-fact, the negligent conduct must be substantial and a necessary antecedent to the injury that occurred. Soileau v. United Services Auto. Ass'n., 509 So.2d 530 (La.App. 3 Cir.1987). The cause-in-fact of an injury is a factual determination which is not to be disturbed absent manifest error. Id. After carefully reviewing all of the evidence presented, we find that the jury's determination was erroneous when it concluded that McManus' actions were not the cause-in-fact of Terry's death. We base our determination on these uncontroverted facts that were adduced at trial: (1) McManus' belief that Terry could have been saved had he not been wrongfully discharged; (2) proof that McManus' negligent conduct was a necessary antecedent to Terry's death; and (3) evidence that Terry would probably not have died absent McManus' conduct. Based on these factors, our prior decision in Trahan I, 653 So.2d 89, and the following analysis, we find that the jury committed manifest error on the question of cause-in-fact.
When an appellate court has all the facts at its disposal it may decide the case on the merits de novo. Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975); Lewis v. Wal-Mart Stores, Inc., 546 So.2d 267, 274-75 (La.App. 3 Cir.1989). Furthermore, a jury's erroneous verdict does not compel an appellate court to remand the case. Id. However, as stated above, before we can reverse a fact-finder's determination we must satisfy the two-part test established in Stobart. First, we must find from the record that a reasonable factual basis does not exist for the jury's finding. Second, we must find that the record establishes that the jury's finding is clearly wrong. We have carefully scrutinized the record to determine whether the jury's findings of fact were manifestly erroneous. We conclude that they are.
In the case sub judice, the record is completely devoid of any facts or allegations indicating that Terry Trahan died from a cause or causes unrelated to McManus' admittedly negligent discharge. Notwithstanding our prior ruling on this issue in Trahan I, the record is replete with testimony, including McManus' own admissions, that he acted negligently when he discharged Terry Trahan, that his actions led to Terry Trahan's death, and that there was treatment available which could have made a difference. Specifically, McManus admits that had he not discharged Terry Trahan, Terry would have survived based on "reasonable medical probabilities." In order for the jury to find that Terry Trahan's death may have occurred despite McManus' negligence, there must exist some factual basis supporting that conclusion *705 in the record. No evidence of an intervening cause or alternative theories regarding the cause of death were proposed by the defendants at any time during the course of this litigation, nor does any such evidence appear in the record. Absent evidence of intervening causes or alternative theories which may have led to Terry Trahan's death, a reasonable factual basis does not exist for the jury's finding.
Therefore, we find that the jury was clearly wrong in deciding that a direct causal connection did not exist between McManus' act of negligently discharging Terry Trahan and his ultimate death. Id. at 533. Before reaching that conclusion, we conducted a two-fold inquiry: (1) Was McManus negligent in discharging Terry Trahan and was that act a cause of Terry's death, and (2) but for McManus' act of negligently discharging Terry Trahan, would he have survived? Our careful review of the evidence presented convinces us that the answers to both questions are in the affirmative and that, therefore, the jury's determination in this regard was manifestly erroneous.
The Louisiana Supreme Court, in Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993) stated:
In Louisiana tort cases and other ordinary civil actions, the plaintiff, in general, has the burden of proving every essential element of his case, including the cause-in-fact of damage, by a preponderance of the evidence, not by some artificially created greater standard. Proof by direct or circumstantial evidence is sufficient to constitute a preponderance, when, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not.
(citations omitted) (emphasis added). The Trahans did more than meet the threshold "preponderance of the evidence" standard, they substantiated their claims with proof by a "reasonable medical certainty." This is a higher degree of proof than is required in the ordinary tort or civil case and is the equivalent of proving it beyond a reasonable doubt. Id. (citations omitted).
Based on the uncontroverted evidence introduced at trial, there is only one permissible and reasonable conclusion the jury could have reached, namely: But for McManus' admitted act of negligent discharge, Terry Trahan would still be alive. Any other conclusion would be utterly unreasonable in light of the facts and overwhelming evidence presented by the Trahans in support of their claim. The jury's conclusion was, therefore, unreasonable and clearly wrong based on the facts as presented.

"THE LAW OF THE CASE" DOCTRINE
Finally, we also find that the "law of the case" doctrine applies to this issue. The doctrine is a procedural rule relating to the finality of appellate rulings and their conclusiveness at trial on remand. Sloane v. Davis, 619 So.2d 585, 588 (La.App. 3 Cir.), cert. denied, 629 So.2d 355 (La.1993). Generally, the "law of the case" doctrine prevents an appellate court from reconsidering its own rulings of law on a subsequent appeal in the same case involving the same litigants. Id. The doctrine was designed to prevent relitigation of the same issues, promote consistency and efficiency, and promote fairness to the parties by affording a single opportunity for argument and decision of the matter at issue. Cree Oil Co. v. Home Ins. Co., 94-1219 (La.App. 3 Cir. 3/8/95); 653 So.2d 620, cert. denied, 95-1554 (La.9/29/95); 660 So.2d 875; Barnett v. Jabusch, 94-819 (La.App. 3 Cir. 2/1/95); 649 So.2d 1158; Widman v. Widman, 93-613 (La.App. 3 Cir. 2/2/94); 631 So.2d 689, 690.
Having rendered a decision on this issue in an earlier appeal, we find the "law of the case" doctrine is applicable in reviewing the correctness of the jury's response to Interrogatory # 2, namely: Did McManus' negligent act cause Terry's death? As stated previously, in deciding whether the Trahans had a cause of action, we determined that the event that caused injury to Terry Trahan was McManus' negligent act of discharging Terry from the hospital. This question of fact had already been decided and, therefore, the jury should not have been given the opportunity to adjudge a factual determination made by this Court. This is particularly true in light of the admissions by McManus and the defendants' failure to advance any alternative theories regarding the cause of *706 Terry's death. The sole issue remaining for the jury at trial was whether the Trahans had proven severe and debilitating emotional distress, entitling them to recovery under La.Civ.Code art. 2315.6.

DAMAGES FOR EMOTIONAL DISTRESS
In their fourth assignment of error, the Trahans contend that the trial court erred in failing to award damages. Based on our finding that the Trahans viewed the event which caused the death of their son, they may recover damages for mental anguish or emotional distress if they prove that their distress is "severe, debilitating, and foreseeable," pursuant to La.Civ.Code art. 2316.5(B).
As this Court has previously recognized, La.Civ.Code art. 2316.5 codified the holding in Lejeune v. Rayne Branch Hosp., 556 So.2d 559 (La.1990). Morris v. Maryland Cas. Co., 94-1556 (La.App. 3 Cir. 5/3/95); 657 So.2d 198. The article is intended to compensate the mental anguish of certain classes of bystanders for a traumatic event that they witnessed and is routinely referred to by this Court as the "bystander recovery law." Morris, 657 So.2d at 199-200. As the article plainly states, this is the only way for a person to recover damages suffered as a result of emotional distress caused by the witnessing of an event causing injury to another. La.Civ.Code art. 2315.6(B).
In order for the Trahans to recover damages under the article 2315.6, they must prove four things by a preponderance of the evidence, namely that: (1) they viewed an event, or came upon the scene of the event, where injury was suffered by another; (2) they were closely related to the injured party, pursuant to subsection (A) of the statute; (3) the injured person suffered such harm that the claimant can be reasonably expected to suffer serious mental anguish or emotional distress from witnessing the experience; and (4) the claimant's mental anguish must be severe, debilitating and foreseeable. La.Civ. Code art. 2315.6; Lejeune, 556 So.2d 559. Louisiana jurisprudence supports an award for mental anguish and emotional distress when a claimant meets those criteria. Rhodes v. State Through Dept. of Transp. and Dev., 94-1758 (La.App. 1 Cir. 5/5/95); 656 So.2d 650 (citing Lejeune, 556 So.2d 559 (La.1990)) (citations omitted); La.Civ.Code art. 2315.6.
We find that the Trahans have met the first and second criteria as evidenced by our aforementioned conclusions. We must, therefore, determine whether Terry Trahan suffered such harm that Mr. and Mrs. Trahan can be reasonably expected to suffer serious mental anguish or emotional distress from witnessing the experience. Based on the facts of this case, it cannot be otherwise. This is especially true when facts adduced at trial showed that: The family had a very close and loving relationship; over a seven-hour period, the Trahans witnessed their son's pain and suffering as he drifted closer to death; and, upon the realization that Terry was not breathing, his father desperately administered CPR in a futile attempt to save him while his mother frantically called for an ambulance.
Lastly, we must determine whether the emotional distress caused by this incident was serious, severe and debilitating, and whether it was reasonably foreseeable. Lejeune, 556 So.2d 559; La.Civ.Code art. 2315.6(B). That the Trahans would suffer from emotional distress at witnessing the death of their son was reasonably foreseeable. Whether the emotional distress was severe and debilitating is a matter of proof. Lejeune, 556 So.2d 559. In Lejeune, the Supreme Court stated:
The emotional distress sustained must be both serious and reasonably foreseeable to allow recovery. Serious emotional distress, of course, goes well beyond simple mental pain and anguish. Compensation for mental pain and anguish over injury to a third person should only be allowed where the emotional injury is both severe and debilitating. For instance, ... "serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." A non-exhaustive list of examples of serious emotional *707 distress includes neuroses, psychoses, chronic depression, phobia and shock.
Id. at 571, (citations omitted). The parents' despondent plight during the seven-hour ordeal that led to the death of their son is well-documented. At trial, testimony was offered by Dr. LaCorgne, a psychologist who interviewed the Trahans on several occasions following their son's death. Based on his observations, he found the Trahans to be severely depressed, consumed with guilt, and unable to accept the fact of death in the five years following the incident. Further, Dr. LaCorgne attributed the cause of these conditions to the insufficient and negligent treatment that was given to Terry. In addition, Dr. LaCorgne stated that the Trahans had failed to resume their "normal" lives in the five years following their son's death. The following except from Dr. LaCorgne's testimony demonstrates the debilitating depression that continues to affect the Trahans.
[I]t can be said very clearly that their lives are not the same. [Mr. Trahan] was very descriptive in giving me information about all the things that he and his wife no longer do, things they used to enjoy. And just don't have the desire for [sic] energy to do any more recreational things, social things, just have lost their joy [sic]. And each of them has a lowered amount of interest and ability to engage in and enjoy these things. [Mr. Trahan] is not the same as he was before this, because of the particular way that this tragedy came about.
Based on the facts and testimony presented at trial, McManus' negligence is the cause-in-fact of the Trahans' mental anguish. For the foregoing reasons, we find that each parent continues to suffer "severe" and "debilitating" emotional distress from the experience. Further, we find that Mr. and Mrs. Trahan each satisfies the requirements of La. Civ. Code art. 2315.6 and are, therefore, entitled to damages.
In determining the amount of damages that should be awarded, we considered a variety of factors including, but not limited to: prior jurisprudence; the relationship between Terry and his parents; and, the circumstances surrounding Terry's death. As the Fifth Circuit noted in Matthews v. Turner, 566 So.2d 133 (La.App. 5 Cir.), cert. denied, 571 So.2d 645 (La.1990), surviving parents are often awarded in excess of $100,000.00 in wrongful death actions. However, the extent of an award authorized under article 2315.6 or Lejeune, is uncertain. Id. In addition, there are many cases in which the courts have found that a claimant has not satisfied the four requirements of the statute, thereby precluding the courts from reaching a determination of quantum. See Crabtree v. State Farm Insurance Co., 93-0509 (La.2/28/94); 632 So.2d 736; Landreneau v. Fruge, 94-553 (La.App. 3 Cir. 6/12/96); 676 So.2d 701; Sandoz v. State Farm Mut. Auto Ins. Co., 620 So.2d 441 (La.App. 3 Cir.1993); Edwards v. Pelican State Mut. Ins. Co., 95-253 (La.App. 3 Cir. 5/31/95); 657 So.2d 440; Deville v. Budd Const. Co., 617 So.2d 570 (La.App. 3 Cir.), cert. denied, 625 So.2d 180 (La.1993); Williams v. Mumphrey, 95-643 (La.App. 5 Cir. 1/30/96); 668 So.2d 1274, cert. denied, 96-569 (La.3/29/96); 670 So.2d 1240; Norred v. Radisson Hotel Corp., 95-0748 (La.App. 1 Cir. 12/15/95); 665 So.2d 753; Delphen v. DOTD, 94-1261 (La.App. 4 Cir. 5/24/95); 657 So.2d 328, cert. denied, 95-2116 (La.11/17/95); 663 So.2d 716; Rhodes, 656 So.2d 650; Dufour v. Westlawn Cemeteries, Inc., 94-81 (La.App. 5 Cir. 6/28/94); 639 So.2d 843; Blair v. Tynes, 610 So.2d 956 (La.App. 1 Cir.1992). Furthermore, the cause of action authorized by article 2315.6 was recently enacted, and as such, there is little jurisprudential guidance in determining an award for a plaintiff who sees a child perish. Matthews, 566 So.2d 133.
Notwithstanding, there are a handful of cases in which awards have been made pursuant to article 2315.6. For example, in Matthews, the First Circuit awarded a mother $50,000.00 for mental anguish in a case whose facts are similar to those presented in the case sub judice. Mrs. Matthews took her daughter, Sabrina, to the emergency room when her daughter complained of abdominal cramps. The doctor at the hospital misdiagnosed Sabrina's appendicitis and sent her home with antibiotics after determining that Sabrina was suffering from a *708 urinary tract infection. Over the next forty-eight hours, Mrs. Matthews contacted the hospital regarding Sabrina's deteriorating condition. Sabrina complained of severe pain and was vomiting profusely. Sabrina's condition continued to worsen until she finally died. Mrs. Matthews attended to Sabrina throughout the ordeal. Sabrina was 18-years-old. The appellate court upheld the $50,000.00 awarded pursuant to article 2315.6, as part of the total award of $250,000.00 for general damages arising from the incident.
In Dunn v. Gentry, 94-1164 (La.App. 3 Cir. 4/5/95); 653 So.2d 783, cert. denied, 655 So.2d 335 (La.1995), this Court awarded each parent $50,000.00 in damages for mental anguish. The parents were determined to have suffered severe emotional distress after seeing their child's mutilated body lying in the road immediately after being hit by a log truck. This court awarded each parent a total of $250,000.00 for damages resulting from the accident. Recently, in Wartell v. Woman's & Children's Hosp., 95-736 (La. App. 3 Cir. 5/22/96); 676 So.2d 632, this Court awarded $5,000.00 in damages for mental anguish to each parent for witnessing the removal of a fetal heart monitor which contributed to the fetus' stillbirth. The Wartells were awarded in excess of $250,000.00 in special and general damages for the stillbirth of the fetus. In In re Medical Review Panel Bilello v. Alton Ochsner Medical Foundation, 621 So.2d 6 (La.App. 4 Cir.1993), the court awarded $63,000.00 in damages for mental anguish to a mother who watched her 14-year-old son die in a hospital following open-heart surgery. Additionally, in both Matthews and In re Medical Review Panel Bilello, no expert medical testimony regarding the plaintiffs' mental states was introduced.
In the case sub judice, the Trahans have only one avenue for recovery stemming from McManus' negligent discharge of Terry Trahan. The parents are foreclosed from bringing wrongful death or survival action claims against McManus due to the existence of Terry Trahan's spouse and child. La.Civ. Code art. 2315.1, 2315.2; La.R.S. 9:2794. Therefore, article 2315.6 presents the only means available for the Trahans to be compensated for the emotional distress arising from the horrible circumstances surrounding the death of their son.
Furthermore, it is uncontested that the relationship between Terry Trahan and his parents was a strong one. Evidence presented at trial indicated that Terry Trahan resumed living with his parents while he was in the process of obtaining a divorce. Although a bond between spouses can sometimes be deemed stronger than a parent-child relationship, especially when a child is older, that is not the case here. In the case sub judice, Terry was living with his parents at the time the accident occurred. Terry was estranged from his wife. His relationship with his parents was, therefore, arguably stronger than that which he shared with his spouse. Furthermore, the parents witnessed Terry's demise, and the spouse did not. Lastly, and most importantly, the Trahans were much more than passive observers to their son's death. They were compelled to participate in the seven-hour ordeal. They watched helplessly as Terry's condition continued to deteriorate. They provided constant attention and were witnesses to his bouts of pain. They tried to rescue him and failed. Expert psychological testimony at trial indicated that the Trahans continue to suffer emotional anguish to this day.
As the First Circuit stated in Rhodes:
"General damages" involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle which cannot be measured definitively in terms of money. The primary objective of awarding general damages is to restore the injured party in as near a fashion as possible to the state the party was in at the time immediately preceding injury. The factors to be considered in assessing quantum for pain and suffering are severity and duration. There is no mechanical rule for determining general damages and the facts and circumstances of each case must control.
656 So.2d at 664-65. The wife and child of Terry Trahan brought a medical malpractice action against McManus and his insurer following *709 Terry's death. The defendants conceded liability to the spouse and child in the amount of $100,000.00, the statutory maximum in a medical malpractice action. After full consideration of the circumstances surrounding this case, and for the aforementioned reasons, we find that Lawrence and Marie Trahan are each entitled to an award for general damages in the amount of $100,000.00.

ERRONEOUS JURY INSTRUCTIONS
In their first and second assignments of error, the Trahans contend that the trial court erred in instructing the jury on the law and burdens of proof applicable to the case. The trial court instructed the jury on a number of issues relating to medical malpractice. In fact, the trial court recited La.R.S. 9:2794, the medical malpractice statute, almost verbatim. The plaintiffs objected timely to the giving of these instructions. The Trahans claim that it was error for the court to instruct the jury regarding medical malpractice as this was not a medical malpractice case. We agree. It is clear that the Trahans' claim was for damages arising from mental distress brought on by witnessing injury to a third person pursuant to La.Civ. Code 2315.6, not a medical malpractice claim pursuant to La.R.S. 9:2794.
The Legislature has defined "malpractice" as:
[A]ny unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from defects in blood, tissue, transplants, drugs and medicines, or from defects in or failures of prosthetic devices, implanted in or used on or in the person of a patient.
Hutchinson v. Patel, 93-2156 (La.5/23/94); 637 So.2d 415, 419; La.R.S. 40:1299.41(A) (emphasis added). In Hutchinson, the plaintiff brought a Tarasoff v. Regents of University of California, 17 Cal.3d 425, 131 Cal. Rptr. 14, 551 P.2d 334 (1976) claim under the Medical Malpractice Act [hereinafter "MMA"] alleging that her husband's psychiatrist failed to warn her of his threats of bodily injury towards her. In rejecting her MMA claim, the Supreme Court stated:
Examining the context of the Act's definition of "malpractice," we find support for the court of appeal's conclusion that the Act does not govern plaintiff's Tarasoff claim because the claim "does not involve the medical care or treatment of a patient " (emphasis added). We find apparent in the Act's definitions ... the legislature's recognition of the traditional rule of law allowing recovery for medical malpractice only where a physician-patient relationship exists as the result of an express or implied contract and where the physician breaches either the contract or his or her professional duty to the patient.

Consistent with the traditional rule governing medical malpractice claims, the definition of "patient" requires the existence of "a contract, express or implied." La.R.S. 40:1299.41(A)(3)....
[W]e conclude the legislature clearly intended to codify the traditional rule in medical malpractice actions requiring either a physician's breach of the express or implied contract between him or her and a patient ("any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient"), or, more pertinent to the allegations in the present case, a physician's breach of the professional standard of care owed by every health care provider to a patient ("any unintentional tort ... based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient"). La.R.S. 40:1299.41(A)(8).
Id. at 421 (citations omitted)(emphasis supplied).
In the case sub judice, the Trahans did not bring a claim on the part of their deceased son. Their claims arose from their own emotional injuries, which stemmed from witnessing the event that caused the death of their son, i.e. McManus' discharge of Terry. *710 The MMA does not provide a cause of action to third parties for damages resulting from actions independent of a physician-patient relationship. Id. Furthermore, Lawrence and Marie Trahan were not the patients of Dr. McManus, nor were they a party to any health care contract. Additionally, Lawrence and Marie Trahan did not claim damages for Terry's pain and suffering. Therefore, the introduction of medical malpractice law in the instructions, with the accompanying restrictive instructions on burdens of proof and causation, served only to confuse the jury regarding the appropriate standard of proof and applicable law. The jury's verdict, therefore, could not have been based upon or guided by essential and correct legal principles. Gonzales, 320 So.2d 163.
As we recently stated in Dunn:
Where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record.
653 So.2d at 787 (citing Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95); 650 So.2d 742). Notwithstanding, having already determined that the jury's verdict was manifestly erroneous and having already conducted a de novo review as to assignments of error three and four, we see no reason to conduct a prolonged analysis of these issues.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is reversed. Judgment is rendered in favor of each parent in the sum of $100,000.00 against McManus and his insurer. Judgment is further rendered in favor of the plaintiffs and against the defendants for interest and all costs here and below.
REVERSED and RENDERED.
DECUIR, J., dissents and assigns written reasons.
AMY, J., dissents.
DECUIR, Judge, dissenting.
The jury found that defendant failed to use reasonable care and diligence in his treatment of the decedent, but that decedent did not suffer an injury as a result of defendant's negligence that he would not otherwise have incurred. This action is unquestionably one in medical malpractice. The applicable statute, La.R.S. 9:2794, provides in pertinent part:
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261, et seq....the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

* * *
C. In medical practice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician... The jury shall be further instructed that injury alone does not raise a presumption of the physician's... negligence. * * *
Therefore, even though defendant may have admitted negligence, the plaintiff still has the burden of proving that decedent's *711 death would not have otherwise occurred absent the defendant's negligence.
The majority places much emphasis on the defendant's admission of negligence, but totally ignores the fact that the jury found that plaintiffs failed to prove that plaintiffs' son's death would not have otherwise occurred absent defendant's negligence. The majority also ignores the medical evidence presented that the decedent would have died at the hospital absent any medical negligence had he not been released. The medical evidence presented at trial reflects that plaintiffs' son experienced the laceration of blood vessels or arteries as a result of the automobile accident. Actual areas of lacerations could not be identified even microscopically and this resulted in extensive retroperitoneal hemorrhage along with his sudden death. In other words, the decedent's condition developed in such a way that his fate would have been no different had he been in the hospital rather than at home. The medical evidence is clearly sufficient to support the jury's findings. The majority ignores the manifest error standard of review.
Thus, I respectfully dissent.